UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KHUM CHAND,

Petitioner,

v.

JULIO HERNANDEZ, *et al.*,

Respondents.

Case No. C26-3721-SKV

ORDER GRANTING IN PART PETITION FOR WRIT OF HABEAS CORPUS

Petitioner is currently detained by U.S. Immigration and Customs Enforcement ("ICE") at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. He filed, through counsel, this amended 28 U.S.C. § 2241 habeas petition, asserting his August 8, 2026, redetention, without first receiving notice and an opportunity to respond, violated his due process rights under the Fifth Amendment. *See* Dkt. 7. He seeks release from custody, a return of his personal property, and injunctive relief related to any future redetention. *Id.* at 18. Respondents filed a return to the petition, Dkt. 8, together with supporting declarations from their counsel Nicole Nardone, Dkt. 9 ("Nardone Decl.") and U.S. Department of Homeland Security ("DHS") Deportation Officer Enrique Rodriguez, Dkt. 10 ("Rodriguez Decl."). Petitioner filed a traverse in reply. Dkt. 13.

Having reviewed the parties' submissions and the governing law, the Court GRANTS in part the amended petition, Dkt. 7, for the reasons set forth herein.

## I. BACKGROUND

Petitioner is a native and citizen of Nepal, who was encountered by U.S. Border Patrol near Lukeville, Arizona on July 5, 2023. Rodriguez Decl., ¶¶ 3-4. Officers determined that Petitioner had entered the United States without inspection. *Id.* ¶ 4. Border Patrol officers served Petitioner with a Notice to Appear ("NTA"), charging him with being inadmissible under the Immigration and Nationality Act ("INA"). *Id.* ¶ 5; *see* Nardone Decl., ¶ 2, Ex. B. Thereafter, Petitioner was released into the United States on his own recognizance, subject to the terms of an Order of Release on Recognizance ("OREC"). Rodriguez Decl., ¶ 6; *see* Nardone Decl., ¶ 2, Ex. A (OREC).

Petitioner appeared for his first scheduled check-in in San Antonio, Texas and was told to report in Dallas within sixty days, which he did. Chand Decl., ¶ 3. In Dallas, he was informed to check back in one year. *Id.* He also sought the assistance of a Nepali-speaking attorney who agreed to assist him if he transferred proceedings to the New York immigration court, which he ultimately did. *Id.* ¶ 4. After moving to New York himself, he filed for asylum and obtained work authorization. *Id.*

Having difficulty finding employment in New York, Petitioner moved to Anchorage, Alaska, where his brother-in-law introduced him to his future employer. *Id.* ¶ 5. His attorney at the time informed him that he could "live anywhere in the United States" as long as he appeared for his hearings in New York. *Id.* ¶ 6. Petitioner was thereafter hired at a local restaurant in Anchorage, but he traveled from Anchorage to New York to attend biometrics appointments and immigration court hearings. *Id.* ¶¶ 6-8. His "final hearing" was scheduled for 2029. *Id.* ¶ 8.

On August 8, 2026, ICE's Office of Enforcement and Removal Operations ("ERO") arrested Petitioner while he was attending an airshow at the Joint Base Elmendorf Richardson in Anchorage, Alaska. Chand Decl., ¶ 11; Rodriguez Decl., ¶ 11. After providing his identification to enter the base, "four men appeared and put [him] in handcuffs and leg shackles." Chand Decl., ¶ 11. Petitioner asserts the men did not explain why they were detaining him. *Id.* DHS administrative records indicate ICE officers determined that because Petitioner had not informed ICE or ERO of his change of address to Anchorage, he was a flight risk. Nardone Decl., ¶ 2, Ex. A at 4.

From the airbase, Petitioner was transferred to the Anchorage police station, where he spent five days in the jail. Chand Decl., ¶ 12. Petitioner contends he requested a Nepali interpreter to no avail. *Id.* He was flown to Tacoma, Washington on or about August 15, 2026, where he was booked into the NWIPC. *Id.* ¶¶ 12-13. He has remained detained since. *Id.* ¶ 13.

On September 10, 2026, Petitioner attended a bond hearing before the immigration court, at which the immigration judge ("IJ") denied bond based on lacking jurisdiction. *See* Nardone Decl., ¶ 2, Ex. G. The checkbox order indicates: "[X] Mandatory Detention under *Matter of M-S* & *Matter of Q. Li*; 235(b)(1) and 235(b)(2)." *Id.* at 2. The second page has another box checked which states: "In the alternative, if the Court had jurisdiction, it would DENY bond based on the following: [X] Flight Risk." *Id.* at 3. It does not appear Petitioner appealed the bond denial order. Rodriguez Decl., ¶ 15.

On September 21, 2026, the immigration court granted Petitioner's attorney's motion to withdraw and Petitioner's motion for a continuance to seek new counsel. *Id.* ¶ 17. Petitioner was scheduled to appear for a master calendar hearing on October 29, 2026. *Id.* ¶ 19. The results of that hearing are unknown.

## II. LEGAL STANDARDS

District courts may grant writs of habeas corpus "within their respective jurisdictions." 28 U.S.C. § 2241(a). This authority extends to challenges to immigration detention. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001). A petitioner may obtain relief by showing that he is "in custody in violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2241(c). A petitioner bears the burden of proof by a preponderance of the evidence. *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

## III. DISCUSSION

Petitioner's sole claim challenges his August 8, 2026, arrest and redetention as violative of his due process rights when assessed under the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Dkt. 7 at 6-12, 16. In response, Respondents contend that Petitioner is subject to mandatory detention under 8 U.S.C. § 1225(b). Dkt. 8 at 6-7. Respondents do not conduct their own *Mathews* analysis but instead concede "[t]hat Petitioner did not receive a pre-deprivation hearing" and acknowledge "that his redetention occurred as a result of his OREC violation is similar to prior cases where courts have found that ICE violated due process." *Id.* at 7 (citing *Ledesma Gonzalez v. Bostock*, 808 F. Supp. 3d 1189 (W.D. Wash. 2025)). Nevertheless, Respondents contend that any due process violation was cured by Petitioner's subsequent September 10, 2026, bond hearing because "[o]rdering immediate release would disregard the circumstances that indicate . . . Petitioner poses a flight risk[, which] distinguishes his case from those in which immediate release has been granted." *Id.* at 8 (citing *Del Valle Castillo v. Wamsley*, No. C25-2054-TMC, 2025 WL 3524932 (W.D. Wash. Nov. 26, 2025)). Finally, Respondents contend that Petitioner should be required to exhaust his administrative remedies by appealing the IJ's bond denial with the Board of Immigration Appeals. *Id.* at 8-10.

**A. Statutory Detention Authority**

The Court briefly observes that, while Respondents assert Petitioner is subject to mandatory detention under 8 U.S.C. § 1225(b), Dkt. 8 at 6-7, they cannot point to any evidence to support their claim. That is not surprising, as the relevant evidence within the current record points to 8 U.S.C. § 1226(a) as being the relevant governing authority. First, Petitioner was released into the United States on an OREC authorized under INA § 236, which is codified at § 1226. *See* 8 U.S.C. § 1226(a)(2)(B); 8 C.F.R. § 236.1(c)(8). In contrast, the only available mechanism to release a noncitizen otherwise mandatorily detained under § 1225(b) is for humanitarian parole. *See* 8 U.S.C. § 1182(d)(5)(A); *see also Jennings v. Rodriguez*, 583 U.S. 281, 283 (2018). Here, there is no evidence Petitioner was ever paroled into the United States. Further, Petitioner's recent arrest shows he is subject to discretionary detention. He was arrested pursuant to a warrant authorized under INA § 236 and ostensibly subject to a custody determination that contemplated release on recognizance, bond, or other conditions as available options for DHS to decide. *See* Nardone Decl., ¶ 2, Ex. B at 6-7.

Respondents' position is also inconsistent. On one hand, they provide legal authority discussing the expedited removal statute in 8 U.S.C. § 1225(b)(1), *see* Dkt. 8 at 3, but then cite to *Rodriguez Vazquez v. Bostock*, 183 F.4th 1160, 1173 (9th Cir. 2026), for the proposition that § 1225(b)(2) instead governs his detention because he "was initially encountered near the border[.]" *Id.* at 6. First, there is no evidence Petitioner was ever subject to the expedited removal process under § 1225(b)(1) when he first entered the United States. Indeed, contemporaneous administrative records note that Petitioner was encountered and "released on his own recognizance due to being a non-priority [noncitizen.]" Nardone Decl., ¶ 2, Ex. A at 3. Second, Respondents' misreading of *Rodriguez Vazquez* continues to be rejected by courts in this

District. *See, e.g.*, *Ortiz-Canales v. Blanche*, No. C26-2748-DGE, 2026 WL 2561542, at *2 n.4 (W.D. Wash. Aug. 31, 2026) ("Respondents insist on turning *Rodriguez Vazquez* on its head . . . "); *Obregon Ante v. Lyons*, No. C26-2464-LK, 2026 WL 2516888, at *3 (W.D. Wash. Aug. 26, 2026) ("Despite recent controlling Ninth Circuit precedent, *Rodriguez Vazquez*, . . . the parties dispute which statute applies to Obregon Ante."). This Court similarly rejects Respondents' argument because under Respondents' logic, every noncitizen currently living in the United States, regardless of when they entered and under what authority, would remain perpetually subject to mandatory detention solely because they were initially stopped at the border. *But see* *Rodriguez Vazquez*, 183 F.4th at 1178 ("[W]e do not think [a noncitizen] present in the interior of the United States remains in the perpetual state of seeking admission (that is, seeking *entry*)[.]") (emphasis in original). Accordingly, Petitioner is subject to discretionary detention under § 1226(a).

**B. *Mathews* and Due Process**

Due process rights extend "to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' . . . interests within the meaning of the Due Process Clause of the Fifth . . . Amendment." *Mathews*, 424 U.S. at 332. "Due process generally "requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).

The *Mathews* test balances three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and

> administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews* 424 U.S. at 335.

Courts in this District apply the *Mathews* framework in cases challenging the lawfulness of a noncitizen's redetention. *See, e.g., E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1321 n.4 (W.D. Wash. 2025) (collecting cases).

First, Petitioner had a liberty interest in his continued freedom. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. When Petitioner was released shortly after entering the United States, he acquired a liberty interest protected by the Due Process Clause. *See Doe v. Becerra*, 787 F. Supp. 3d 1083, 1093 (E.D. Cal. 2025) ("The Supreme Court has repeatedly recognized that individuals who have been released from custody, even where such release is conditional, have a liberty interest in their continued liberty."); *see also Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1136 (W.D. Wash. 2025). This factor favors Petitioner.

As for the second factor, there was a high risk of erroneous deprivation and value in additional safeguards. It is undisputed that Petitioner was redetained without process. Dkt. 8 at 7. When Petitioner was released into the United States, the Government necessarily first determined that he posed neither a danger to the community, nor a flight risk. *See* 8 C.F.R. § 236.1(c)(8). To then unilaterally revoke that release, without providing any individualized, pre-deprivation process to determine whether Petitioner now poses a risk, came with a high risk of error. *See Alfaro Siguenza v. Hernandez*, 2026 WL 2587980, at *4 (W.D. Wash. Aug. 27, 2026) (citing *E.A. T.-B.*, 795 F. Supp. 3d at 1323). While the record contains a "Notice of Custody

Determination" form, *see* Nardone Decl., ¶ 2, Ex. E at 2, Respondents offer no explanation of that process, what was considered, or why the signing DHS officer ultimately concluded that Petitioner should remain detained for the remainder of his removal proceedings. The Court reiterates that there is no evidence that Petitioner ever missed an immigration hearing and, at the time of his detention, was scheduled to attend his final hearing in 2029. The Court finds that pre-deprivation process would have been valuable in allowing Petitioner to challenge the legal bases for his redetention, as well as the decision to keep him detained for the remainder of his removal proceedings.

As for the final factor, Respondents do not identify a governmental interest advanced by Petitioner's redetention, but rather "rest on the . . . arguments" advanced by the Government in prior Western District cases. Dkt. 8 at 7 (citations omitted). Respondents do not cite any court rule or legal authority allowing them to adopt or incorporate pleadings or briefs filed in prior habeas petitions. *See id.* And as Petitioner notes, parties have limited access to unrelated immigration habeas filings, making it difficult or impossible for a petitioner to address incorporated arguments in their reply brief. Dkt. 13 at 5 n.1. *See also* LCR 5.2(c) (requiring "the administrative record" in immigration actions relating to detention to be filed and maintained under seal given the "prevalence of sensitive information and the volume of filings"). Accordingly, the Court will not attempt to identify or address any arguments made regarding the Government's interest from previous, unrelated habeas petitions. Nor would it likely be appropriate, as the purpose of the *Mathews* framework in this context is to identify the Governmental interest in redetaining the petitioner. In other words, it is individualized.

In sum, the *Mathews* factors weigh in Petitioner's favor, which entitles him to habeas relief. Before deciding what relief is appropriate, the Court addresses the September 10, 2026, bond hearing that occurred while Petitioner was detained.

**C. <u>September 10, 2026 Bond Hearing</u>**

The parties dispute what legal import the September 10, 2026, bond hearing had on Petitioner's instant petition. Petitioner asserts that it has no relevance to his claim challenging his August redetention because *Mathews* is focused on the process afforded at the time the government infringes on the identified liberty interest. Dkt. 13 at 2. Respondents, on the other hand, acknowledge that Petitioner's redetention claim is likely meritorious under Western District authority, Dkt. 8 at 7, but assert the subsequently provided bond hearing renders Petitioner's habeas petition procedurally distinct from cases in which immediate release was granted. *See id.* at 8 (citation omitted). Respondents further argue that, because "Petitioner has raised no challenges to his bond hearing and the record shows that there were no constitutional or legal issues with Petitioner's bond hearing," he is not entitled to release. *Id.* at 10. In his reply, Petitioner asserts that Respondents' position "is irreconcilable with caselaw establishing that a 'post-deprivation hearing cannot serve as an adequate procedural safeguard because it is after the fact and cannot prevent an erroneous deprivation of liberty.'" Dkt. 13 at 9 (quoting *E.A. T.-B.*, 795 F. Supp. 3d at 1324).

It is true that courts within this District have repeatedly found that post-deprivation bond hearings are inadequate remedies for violations under procedural due process. *See, e.g.*, *E.A. -T.B.*, 795 F. Supp. 3d at 1324; *Ledesma Gonzalez*, 808 F. Supp. 3d at 1204; *see also Ramirez Tesara*, 800 F. Supp. 3d at 1138 (granting petitioner's motion for a temporary restraining order that challenged his redetention under *Mathews* and finding that "immediate release [wa]s

necessary to restore the status quo ante litem") (underlining in original). That said, there is also a line of authority that nevertheless acknowledges that lawful post-deprivation bond hearings are legally relevant for purposes of a habeas petitioner's challenge to their detention. *See, e.g.*, *Singh v. Noem*, No. C26-0304-GJL, 2026 WL 482389, at *3 (W.D. Wash. Feb. 20, 2026) (and the Western District cases cited therein).

Here, however, the Court does not find the September 10, 2026, bond hearing supplies any lawful authority relevant to Petitioner's current detention because the IJ expressly declined jurisdiction, rendering his "alternative" flight risk finding illusory. *See Orff v. United* States, 358 F.3d 1137, 1149 (9th Cir. 2004) (acknowledging the court "must vacate as nullities the district court's rulings on the merits" because the district court lacked subject matter jurisdiction). Neither party has assigned legal error to the IJ's decision that he lacked subject matter jurisdiction. Accordingly, the Court does not find that the September 10, 2026, bond hearing cured or prevents Petitioner from challenging his August 8, 2026, redetention.

There are some situations in which courts have found that post-deprivation hearings *are* adequate remedies when there have been significant changes in the petitioner's circumstances since being released, such as a criminal arrest or conviction. *See Reyes v. Hernandez*, 2026 WL 820481, at *6 (W.D. Wash. Mar. 25, 2026) (collecting cases where courts ordered a post-deprivation hearing "where petitioners had been arrested and charged with a crime after their initial release"). Here, however, the Court does not find Respondents have identified a materially significant change in Petitioner's circumstances that would make release from custody improper or a bond hearing adequate under Due Process.

The Court therefore finds that restoring Petitioner to the status he held prior to the erroneous deprivation is the appropriate remedy.

**D. Injunctive Relief**

Petitioner also seeks to enjoin the Government from redetaining him without first providing written notice and a hearing at which the Government provides clear and convincing evidence that Petitioner is a danger or flight risk. Dkt. 7 at 18. He also seeks to enjoin the Government from using a GPS monitoring device on him during the pendency of his removal proceedings. *Id.*

While Petitioner has demonstrated his August 8, 2026, redetention was unlawful under *Mathews*, it does not necessarily follow that he remains subject to the same "cognizable danger of recurrent violation." *Cummings v. Connell*, 316 F.3d 886, 897 (9th Cir. 2003). As for Petitioner's fear of being subjected to GPS monitoring, the factual record is not sufficiently developed to support his request. Petitioner's request for permanent injunctive relief is denied without prejudice.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the amended habeas petition in part, Dkt. 7, and ORDERS that Petitioner be RELEASED from immigration detention within **twenty-four (24) hours** under the conditions of the OREC in effect at the time of his redetention. Respondents shall file a status report with the Court within **forty-eight (48) hours** that Petitioner has been released. Petitioner's request for permanent injunctive relief is DENIED. Any fee petition shall be filed within the deadlines set by the Equal Access to Justice Act ("EAJA"), 28

/ / /

/ / /

/ / /

/ / /

U.S.C. § 2412.

Dated this 18th day of November, 2026.

S. KATE VAUGHAN
United States Magistrate Judge